CASE NO. 23-1145
_____

**THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**
_____

STEPHEN CAUDLE,

*Plaintiff-Appellant*,

v.

HARD DRIVE EXPRESS, INC., and
JAMES BETZ

*Defendant-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Michigan
_____

**APPELLANT'S REPLY BRIEF**

**Oral Argument Requested**

**MILLER COHEN, P.L.C.**
Keith Flynn (P74192)
*Attorney for Plaintiff*
7700 Second Avenue, Suite 335
Detroit, Michigan 48202
(313) 964-4454
kflynn@millercohen.com

# **TABLE OF CONTENTS**

**PAGE(S)**

TABLE OF AUTHORITIES ................................................................................... ii

I. INTRODUCTION .........................................................................................1

II. ARGUMENT ...............................................................................................3

    A. Defendant-Appellees' Brief on Appeal Ignores Relevant Case Law Regarding Retaliatory Discharge Cases and Vast Sections of the Record ……………………………………………………………………...3
       1. The District Court's Decision Should be Reversed Due to Errors of Law…………………………………….…………………………..5
       2. The Decision Should be Reversed Because There are Genuine Issues of Material Fact………………………………...…………….7

    B. Defendants' *Ad Hominem* Attacks Against Plaintiff are Mere Pretext for Their Retaliatory Motivation ……………………….…….…….……12

# TABLE OF AUTHORITIES

**P**AGE(s)

*Anderson v. Liberty Lobby, Inc,*

    477 U.S. 242 (1986)......................................................................................1

*Hamilton v. GE,*

    556 F.3d 428 (6th Cir 2009) ......................................................................2, 5

*Jones v Potter*,

    488 F3d 397 (6th Cir 2007) .......................................................................2, 5

*Kasten v. Saint-Gobain Performance Plastics Corp.,*

    563 U.S. 1 (2011).........................................................................................6

*Mulhall v. Ashcroft*,

    287 F.3d 543 (6th Cir. 2002) .....................................................................2, 6

*Moore v. Freeman*,

    355 F.3d 558 (6th Cir. 2004).......................................................................6

*Reeser v. Henry Ford Health Sys*,

    119 F. Supp. 3d 710 (E.D. Mich. 2015) ....................................................2, 5

## **Statutes & Rules**

29 U.S.C. 206................................................................................................4

29 CFR 531.35...............................................................................................4

MCL §408.472................................................................................................4

## I. INTRODUCTION

After reviewing Defendant-Appellees' Brief on Appeal, there are some points that the parties can agree on. Defendant-Appellees assert that "[t]he issue before this Court is narrow and straightforward." [Dkt. No. 24, pg.16] Agreed— "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Id.* at 255. This is a "narrow and straightforward" task that respects the respective roles of both the trial judge and the jury.

Defendants also correctly summarized the decision being appealed. Namely, the trial court "determined that **on the date of Plaintiff's termination**, he complained to Defendants about Hard Drive's new PTO policy and . . . [s]ince PTO time is not mandated under the FLSA, Defendants were not on notice of a claim of violation of a right protected by the statute." [Id.] (emphasis added) Agreed, that was the trial court's reasoning for dismissal. That reasoning is also part of the error though.

There is no *prima facie* requirement that an employee must prove that they engaged in protected activity **on the date** of the adverse employment action about which the employer was on notice. Neither the trial court nor Defendants have cited a single source of authority for such an element. Instead, the exact opposite is true—all that is required by the second element to prove a claim of retaliatory discharge is that the decision-maker knew about the protected activity before the adverse employment action. *See e.g.*, *Hamilton v. GE*, 556 F.3d 428, 436 (quoting *Jones v Potter*, 488 F3d 397, 408 (6th Cir 2007)(emphasis added)); *Mulhall v. Ashcroft*, 287 F.3d 543, 552-53 (6th Cir. 2002); *Reeser v. Henry Ford Health Sys.*, 119 F. Supp. 3d 710, 720 (E.D. Mich. 2015).

Furthermore, large swathes of the evidence in the record would have to be ignored or, at minimum, given limited weight in order to reach Defendants' conclusion that they had no knowledge. The Court would have to ignore Defendants admitting, even in their Appellee Brief no less, that they were aware of Plaintiff's numerous wage complaints prior to termination. Similarly ignored would be Defendant Betz's text message sent to Plaintiff three days before his termination stating that drivers who say that they "want[] to be paid for the time it takes to get something fixed on the truck makes my decision a lot easier" and noting that it was "[v]ery disappointing" considering that he loaned Plaintiff money without charging interest. ECF 38-5, Page.ID 807.

Further shoved to the side would be the text messages from Betz to Plaintiff the day of Plaintiff's discharge where he once again brought up Plaintiff's protected activity complaining about drivers who "expect to pay to have something done for the truck" and referring to how bitter he was over these complaints. ECF 38-5, Page.ID 808.  Also erased to reach such a conclusion would be Plaintiff's response to that text message from Betz stating, "**That's right your truck your company I'll get my money**" promising to use "the proper channels" and that he was on his way to the Labor Board.  Id. Further crossed out would be Defendant Betz's text message the next day implicitly acknowledging that Plaintiff was going to the Labor Board about the servicing of Defendants' truck, threatening a retaliatory counterclaim against Plaintiff, and sarcastically offering to set up an appointment with the Labor Board in Michigan. ECF 38-5, Page.ID 810

Frankly, the Undersigned struggles to think of a more clear-cut, straightforward case than the above-captioned lawsuit given the degree of Defendant Betz's bluntness over his retaliatory animus.  Consequently, Plaintiff requests that the lower court's decision be reversed and that this matter be remanded for a jury trial.

## II.  ARGUMENT

### A. Defendant-Appellees' Brief on Appeal Ignores Relevant Case Law Regarding Retaliatory Discharge Cases and Vast Sections of the Record

Defendant-Appellees' Brief on Appeal fails to address the inherent contradictions found in the lower court's opinion. On the one hand, the lower court dismissed Plaintiff's lawsuit finding that he had not produced sufficient evidence for a reasonable jury to have found that Defendant knew about Plaintiff exercising his rights. Yet, on the other hand, the lower court found that, "Given that **Caudle has made informal complaints related to pay and wages since 2017**, and taking the facts in the light most favorable to Plaintiff as the non-moving party, it can be reasonably inferred that Caudle engaged in protected activity." **ECF 47**, Page.ID 1478 (emphasis added).[1] Further, the district court noted that, "**Defendants concede that Plaintiff had been complaining as early as 2017 about allegedly unpaid services or on-reimbursement of out-of-pocket expenses and had threatened to report Hard Drive before**." Id. at 1478 (emphasis added).[2]

---

[1] There is no dispute that such complaints constituted protected activity under the Fair Labor Standards Act ("FLSA"). Employers are required to pay employees a minimum wage for all hours worked 29 U.S.C. 206. Wages must be paid "free and clear" of out-of-pocket expenses made for the benefit of the employer. 29 CFR 531.35. Further, Michigan law requires employers to pay employees for all wages earned. MCL §408.472. Also, the Michigan Whistleblower Protection Act (WPA) prohibits employers from discriminating against employees who are about to report suspected violations of law to a public body.

[2] Appellees reiterated in their Brief on Appeal that they were aware that Plaintiff "**repeatedly complained . . . and threatened to report the company, about alleged unpaid services or non-reimbursed, out-of-pocket expenses**." [Dkt. 24, pg. 11](emphasis added)

4

In dismissing Plaintiff's lawsuit, the district court seemingly focused entirely on the events of February 15, 2019, the day Plaintiff was terminated. In doing so, the district court made errors of both law and fact.

1. <u>The District Court's Decision Should be Reversed Due to Errors of Law.</u>

There is no requirement that an employee must prove under a Fair Labor Standards Act (FLSA) retaliation or Whistleblowers' Protection Act (WPA) claim that the protected activity occurred on the date of the adverse employment action. Neither the lower court nor Defendants have cited such a case.

Indeed, the opposite is true—numerous cases have denied dispositive motions where an employer had notice that the employee had engaged in protected activity months prior to the date of their discharge. *See e.g.*, *Hamilton supra* at 436 (employer could not "insulate itself from a charge of retaliatory termination by staging an incident to display its purported 'favorable treatment' and then waiting for a second opportunity to terminate the employee); *Reeser v. Henry Ford Health Sys.*, 119 F. Supp. 3d 710, 720 (E.D. Mich. 2015). As the Sixth Circuit noted in *Hamilton v. GE*, the very definition of pretext constituting evidence of unlawful discrimination is where "The employer . . . waits for a legal, legitimate reason to fortuitously materialize, and then uses it to cover up his **<u>true, longstanding motivations</u>** for firing the employee." *Hamilton v. GE*, 556 F.3d 428, 436 (quoting *Jones v Potter*, 488 F3d 397, 408 (6th Cir 2007)(emphasis added)).

Instead, the second prima facie element for a claim of retaliatory discharge merely requires the plaintiff to establish knowledge on the part of the decisionmaker that the plaintiff had engaged in protected activity[3] before the adverse employment action. *Mulhall v. Ashcroft*, 287 F.3d 543, 552-53 (6th Cir. 2002). A plaintiff can do that by producing direct or circumstantial evidence of knowledge, not merely speculation or intuition. *Id.* [4]

In this case, the lower court correctly acknowledged in this case that there is no dispute that Plaintiff engaged in protected activity that the Defendants had known about for some time—**it was conceded by the Defendants**. The decision-maker--Defendant Betz—expressly brought up Plaintiff's protected activity throughout the text messages from February 12 to the 15—the date of Plaintiff's termination. Betz even admitted at his deposition to being aware. **ECF 38-3**, Betz Dep. 131 lines 16-

---

[3] Again, FLSA "protected activity" includes informal, internal complaints regarding pay, wages, and hours, even if those complaints are only oral. *Kasten v. Saint-Gobain Performance Plastics Corp.,* 563 U.S. 1 (2011); *Moore v. Freeman*, 355 F.3d 558, 562 (6th Cir. 2004)(plaintiff's informal complaints to management about his unequal pay on the basis of race were sufficient to trigger protection under the anti-retaliation provisions of the FLSA).

[4] Notably, the lower court relied on *Kasten v. Saint-Gobain Performance Plastics Corp.*—a case dealing with whether a plaintiff engaged in protected activity—not the second element regarding the decision-maker's knowledge. 563 U.S. 1 (2011). Even then, the question of whether Plaintiff's earlier oral complaints or his complaint on February 15th were sufficient to provide fair notice is a question of fact for a jury to decide. Mr. Caudle testified that he regularly complained to Betz about his failure to pay him for time that he spent making repairs to Defendants' truck as well as expenses that he incurred buying parts. ECF 38-2, ¶3-6. Further, Mr. Betz's text messages indicate that was what Plaintiff had been complaining about.

24, 135 lines 23-25, 136 lines 1-6, 173 lines 8-9, 250 lines 10-11, 260 lines 1-7. Consequently, the trial court's decision is based on an error of law and should be reversed and remanded for trial.

    2. <u>The Decision Should be Reversed Because There are Genuine Issues of Material Fact</u>

*Arguendo*, ignoring the legal errors entirely, there still exists genuine issues of material fact as to the events leading up to February 15, 2019. Defendants solely fixate on their purported interpretation of the text message chain from February 15, 2019, which itself is largely based on Defendants ignoring the text messages and surrounding context inconvenient to their narrative. They argue that Plaintiff only inquired about the employer's PTO policy on February 15, 2019, not about the unreimbursed expenses and uncompensated hours Plaintiff spent servicing Defendants' truck.

That completely ignores the fact that Defendant Betz acknowledge that Plaintiff had sought compensation for servicing the truck just three days prior to his termination on February 12:

> When a driver says he wants paid for the time it takes to get something fixed on the truck makes my decision a lot easier. How much money over time have I loaned you with out any interest? Very disappointing. I will not be excepting [sp] any calls or texts tonight. If I have to I will turn off my phone.

ECF 38-5, Page.ID 807. Not only was Mr. Betz aware of protected activity before the discharge, he made an implicit threat against Mr. Caudle for having

7

raised the issue, noting that it "makes my decision a lot easier." Id.

The better interpretation would be that Defendant Betz specifically described his true, longstanding motivations for firing Mr. Caudle via text right before terminating him, and it had nothing to do with Mr. Caudle inquiring about the PTO policy. Namely, Betz reiterated **right before** he terminated Plaintiff, "Another word, I make loans with no interest and **still expect to pay to have something done for the truck**." ECF 38-5, Page.ID 808 (emphasis added). Mr. Caudle responded to that text with, "**That's right your truck your company I'll get my money**." Id. Immediately after that Plaintiff stated, "I'm not gonna argue with you **I'll go to the proper channels**." Id. (emphasis added)

Given the context that Plaintiff was responding to a text about employees expecting to get paid for having something done for Defendants' truck, Plaintiff was clearly referencing his previous complaints seeking reimbursement for costs associated with Defendants' truck.

Did Betz respond by discussing the PTO policy?[5] No, Defendant Betz further clarified his "long-standing motivations"—

---

[5] Notably, Defendant Betz mischaracterized the PTO policy stating, "Must fill out vacation request form 30 days in advance" and must remain employed with the company two weeks before and two weeks after. That is not what the Defendants' Employee Handbook states: "30 days in advance or **as much in advance in possible**." R. 37-10, Page.ID 509. Also, nowhere in the Employee Handbook does it mention Mr. Betz's two-week requirement. Id.

8

> You're the one that doesn't understand. I help all the people that work for one way or another. Like make loans. Then not charge them any interest like a bank would. **Then ask someone to take a truck to get something taken care of and they want paid for it**. **It has made me very bitter**. I don't mind helping anyone, but get the shit I get after I have help them not going to happen anymore. I'm no longer a bank.

ECF 38-5, Page.ID 808 (emphasis added). After that text from Defendant Betz, Mr. Caudle clarified what he meant when he said that he would be using "proper channels" to get paid back the money that he paid out-of-pocket for Defendants' truck: "I give you 10 minutes buddy **I'm on my way to the labor board** I'm done playing with you . . ." Id. (emphasis added). Only after that text from Plaintiff did Mr. Betz terminate his employment.

But Mr. Betz was not done. The very next day after Plaintiff's termination, Mr. Betz texted Plaintiff again to further elaborate on his rationale for Plaintiff's discharge:

> Michigan is an (At Will) state. This means I can terminate anyone for no reason. **In your case, you were and have several times been argumentative with me and the office**. I decided you no longer needed to be employed with Hard Drive Express. That's the way the state law works. **The 15 or 20 times that you change the fuel filter on the truck will get you about, let's calculate this out. ½ hour per filter (which is what I pay the shop) 10 hours (paying you 20 times changing filter) times $9.00 (minimum wage is all I'm required to pay) equals $90.** Again, I will be following the Drivers Handbook and ask them to collect $1970 in repairs to the truck you damage. **Would you like me to set up an appointment with the Labor Board in Michigan**?

**ECF 38-5**, PageID. 810 (emphasis added).

9

Defendant Betz's own words the very next day reflect that he terminated Plaintiff for being "argumentative" in the past on several occasions, not for inquiring about PTO.[6] The question to be further answered by a jury is what Betz was referring to when he claimed that Plaintiff was "argumentative." Again, Defendant Betz added further clarity in the very next sentence of the February 16 text message by directly referencing the issues Plaintiff raised regarding servicing Defendants' truck without being compensated or reimbursed for out-of-pocket expenses.

Moreover, an inference could be drawn from Mr. Betz's February 16 email that he believed that Plaintiff was going to the Labor Board to report the unreimbursed expenses and time spent servicing Defendants' truck. Betz brought those issues up again in relation to his decision that Plaintiff "no longer needed to be employed with Hard Drive Express."  More so, this text message is black-and-white evidence that Defendant was aware of those complaints given that he explained the amount that he pays other employees for the services that Plaintiff was performing for free. Further damning though, the February 16 text message shows that Betz was willing to take action to deter Mr. Caudle from reporting him to the

---

[6] When discussing past arguments with Mr. Caudle, Mr. Betz testified that he put Caudle on speaker and had others in the office to silently witness the conversation without Mr. Caudle's knowledge.  ECF 38-3, Page.ID 173. When asked why he did that, Mr. Betz testified that, "Caudle does this all the time, threatens. I mean, he instigates problems." When asked about what kind of problems, Betz revealed under oath, "**I just told you about wages, about everything**." Id. (emphasis added).

government. Namely, Defendant Betz threatened to request that the Labor Board collect against Plaintiff for unspecified repair costs. While the U.S. Department of Labor and the Michigan Wage and Hour Division do not pursue claims brought against employees, his threat was clearly meant to discourage Plaintiff from making a report of unpaid wages and expenses to the government.

Accepting all inferences in the light most favorable to the Plaintiff, a reasonable jury could easily agree with Plaintiff's interpretation of the February 15, 2019, text chain. This is especially true given the testimony offered by both of the participants to that conversation. Plaintiff testified that, "The reason I said I was going to the labor board was because I planned to file charges against Hard Drive Express for failing to pay me for my expenses and time. I believed this violated the law." ECF 38-2, PageID 726, ¶12. He testified that he made it to the Virginia Labor Board that same day. Id. In fact, that is where he was when he noticed that he had been terminated via text. Id.

To his credit, Defendant Betz agreed with Plaintiff's interpretation of the text message chain that he was referring to Plaintiff's earlier complaints about not being paid for all of the hours worked or being reimbursed for expenses relating to Defendants' truck. **ECF 38-5; ECF 38-3,** Betz Dep. pg. 245 lines 6-22. This led Mr. Caudle to say that he was not going to argue with Betz and that he would "go to the proper channels," which Betz testified that he interpreted that to mean the Labor

Board. *Id.* at 249 lines 1-16. Betz further noted that this was about Plaintiff demanding to be paid for taking care of the truck and that he was bitter over that. *Id.* at 250 lines 7-15. Only defense counsel seems to believe in a different interpretation of the text message chain—an interpretation that they concocted after this lawsuit was filed.

There is clearly sufficient evidence to support the existence of a genuine issue of material fact that Defendants were aware of Plaintiff's protected activity complaining and threatening to report his employer's failure to pay wages "free and clear" to the government.

### B. Defendants' *Ad Hominem* Attacks Against Plaintiff are Mere Pretext for Their Retaliatory Motivation

According to Defendants, "Plaintiff was terminated by Mr. Betz on February 15, 2019 In the early afternoon just before [Plaintiff] commenced sending a barrage of text messages to create a false narrative that he was a whistleblower." ECF 38-10, Page.ID 844. Defendants explained that, "The direct cause of the termination was [Plaintiff's] insubordinate and outrageous arguments with Mr. Betz, including repeated swearing and referring to Mr. Betz as a mother fucker." Id.

While defense counsel continues to accuse Plaintiff of being belligerent, swearing, and insubordinate as justification for his termination, that too is being factually disputed. Notably, the text messages from February 15 show that the only person who used profanity was Mr. Betz. ECF 38-5, Page.ID 808; ECF 38-3,

12

Page.ID 794, pgs. 252-54.[7] When asked what was insubordinate about Mr. Caudle's texts on February 15, Mr. Betz testified that, "Just Mr. Caudle as a whole as his attitude. **He was always disrespectful**. **He didn't appreciate what I did for him when he called up, needed to borrow money or anything**. **To me, that is disrespectful**." Id. at 253 (emphasis added). When asked to point out a specific text where Mr. Caudle was "disrespectful," the only text messages that Betz could point to were **AFTER** Plaintiff was already terminated. Id. at 255-56.

After failing to identify what specifically was insubordinate, belligerent, or profane about Mr. Caudle's text messages leading up to his termination, Mr. Betz then changed the story testifying that Plaintiff was terminated for his tone during a telephone conversation that he purportedly had with Mr. Caudle on February 15th right **BEFORE** Caudle was terminated.

Plaintiff flatly denied under oath that such a conversation took place, hence, there is a genuine issue of material fact that he did not use profanity or disrespect Betz. ECF 38-2, Page.ID 726, ¶13. Moreover, Mr. Betz was forced to admit at his

---

[7] Regardless of who cussed at who, profanity was quite common at Hard Drive Express. Plaintiff testified that the use of profanity was quite common at Hard Drive Express—in fact, Mr. Betz routinely swore at his employees. ECF 38-2, ¶6. Even Mr. Betz agreed noting that other drivers would call him up cussing him out or calling him a motherfucker—instead of disciplining them, he testified that he would tell drivers, "I'd rather you get your frustrations out on me than at a customer, you know." ECF 38-3, Page.ID 747-48, pgs. 66-67, 70. Further, Mr. Betz testified that he did not discipline Plaintiff for being rude or cussing at him in the past. Id. at 202.

13

deposition that, if that telephone conversation did happen, it would not have been before Plaintiff's termination, but after. ECF 38-3, pgs. 265-68. In other words, the only communication that took place between Plaintiff and Betz on February 15 were the text messages from Plaintiff, none of which were belligerent, profane, or insubordinate.

**WHEREFORE,** Plaintiff respectfully requests that the lower court's decision to grant Defendant's Motion for Summary Judgment be reversed and the case be remanded for trial.

Dated: July 3, 2023

Respectfully submitted,

**MILLER COHEN, P.L.C.**

By: /s/Keith D. Flynn
Keith D. Flynn (P74192)
*Attorneys for Plaintiff-Appellant*
7700 Second Avenue, Suite 335
Detroit, MI 48226
(313) 964-4454 Phone
kflynn@millercohen.com

# CERTIFICATE OF COMPLIANCE

## TYPE-VOLUME LIMITATIONS, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

> This brief contains 3541words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> This brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 (2019) in 14-point font size and Times New Roman type style

.
Dated: July 3, 2023                    Respectfully submitted,

**MILLER COHEN, P.L.C.**

By:  /s/Keith D. Flynn
Keith D. Flynn (P74192)
*Attorneys for Plaintiff-Appellant*
7700 Second Avenue, Suite 335
Detroit, MI  48226
(313) 964-4454 Phone
kflynn@millercohen.com

**CERTIFICATE OF SERVICE**

I hereby certify that on *July 3, 2023*, I electronically filed *Appellant's Reply Brief* with the Clerk of the Court using the ECF system, which will send notification of such filing to all parties of record.

Dated: July 3, 2023  Respectfully submitted,

**MILLER COHEN, P.L.C.**

By:  */s/Keith D. Flynn*
Keith D. Flynn (P74192)
*Attorneys for Plaintiff-Appellant*
7700 Second Avenue, Suite 335
Detroit, MI 48226
(313) 964-4454 Phone
kflynn@millercohen.com